**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

SPRINT CORPORATION,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents.*

T-MOBILE USA, INC.,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of Final Orders
of the Federal Communications Commission

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES**
**OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**
**SPRINT CORPORATION AND T-MOBILE USA, INC. AND FOR**
**VACATUR OF THE FCC'S FORFEITURE ORDERS**

Mariel A. Brookins
 *Counsel of Record*
Maria C. Monaghan
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 659-6000
mbrookins@USChamber.com

*Counsel for* Amicus Curiae

December 2, 2024

i

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amicus curiae* states as follows:

## A. Parties and *Amicus*:

Except for the following, all parties, intervenors, and *amici* appearing in this Court in these consolidated cases are listed in the Brief of Petitioners T-Mobile USA, Inc. and Sprint Corporation. As of the finalization of this brief, *amici* appearing in this Court in these consolidated cases are The Chamber of Commerce of the United States of America ("Chamber") and CTIA – The Wireless Association.

## B. Ruling(s) Under Review:

Petitioners seek direct review of the Federal Communications Commission's ("FCC" or "Commission") orders in *T-Mobile USA, Inc.*, Forfeiture Order, File No. EB-TCD-18-00027702 (2024) and *Sprint Corporation,* Forfeiture Order, File No. EB-TCD-18-00027700 (2024). There are no prior rulings under review.

## C. Related Cases:

These cases were not previously before this Court or any other court. The following cases deal with similar Commission forfeiture orders, but do not involve substantially the same parties as this case: *AT&T, Inc. v. FCC*, No. 24-1225 (5th Cir.) and *Verizon Communications Inc. v. FCC*, No. 24-1733 (2d Cir.).

/s/ Mariel A. Brookins
Counsel for *Amicus Curiae*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that *Amicus Curiae* The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber. The undersigned counsel further certifies that all parties have consented to *amicus curiae*'s participation in this case.

*/s/* Mariel A. Brookins
Counsel for *Amicus Curiae*

# CIRCUIT RULE 29(D) CERTIFICATE

*Amicus curiae* The Chamber of Commerce of the United States of America certifies that a separate *amicus* brief is necessary. This brief provides the unique perspective of the world's largest business organization which has represented the interests of its members for over a century. The Chamber's decades of experience participating in legislative, regulatory, and litigation matters involving agency overreach as well as the collection and use of data by American businesses is directly relevant to the issues presented in this appeal.

*/s/* Mariel A. Brookins
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................. i

Rule 26.1 Corporate Disclosure Statement ............................................. ii

Circuit Rule 29(d) Certificate ................................................................. iii

Table of Authorities ...............................................................................v

Glossary ................................................................................................ viii

Interest of *Amicus Curiae* .......................................................................1

Statutes and Regulations .........................................................................3

Introduction and Summary .......................................................................3

Argument ..................................................................................................7

    I.    The Constitution Prohibits The FCC's Process For Imposing Penalties ...............................................................................................7

        A.    The Seventh Amendment Entitled T-Mobile and Sprint to A Jury Trial .....................................................................8

        B.    Section 504(a) Does Not Save The FCC's Approach to Imposing Forfeitures ...............................................................13

    II.    The FCC's Interpretation of the Statute to Permit the Imposition of Unpredictable and Massive Civil Penalties Is Plainly Wrong ............21

Conclusion ..............................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AT&T Corp. v. FCC*,
  323 F.3d 1081 (D.C. Cir. 2003) ........................................................17

*Atlas Roofing Co. v. OSHA*,
  430 U.S. 442 (1977) ........................................................................11

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
  467 U.S. 837 (1984) ........................................................................25

*Connally v. General Constr. Co.*,
  269 U.S. 385 (1926) ........................................................................27

*FCC v. Fox Television Stations*,
  567 U.S. 239 (2012) ..................................................................19, 20

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ....................................................27, 28

*Howmet Corp. v. EPA*,
  656 F. Supp. 2d 167 (D.C. Cir. 2009) ..............................................28

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) ..........................................................................17

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ..................................................2, 14, 26, 28

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ..........................................................14

*Satellite Broad. Co., Inc. v. FCC*,
  824 F.2d 1 (D.C. Cir. 1987) ............................................................27

*SEC v. Jarkesy*,
  144 S. Ct. 2117 (2024) ......................... 2, 6, 7, 8, 9, 10, 11, 12, 13, 18

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017) ..................................................27, 28

*United States v. Any & All Radio Station Transmission Equip.*,
207 F.3d 458, 463 (8th Cir. 2000) ......................................................14

*United States v. Dunifer*,
219 F.3d 1004 (9th Cir. 2000) ...........................................................14

*United States v. Olenick*,
No. 18-CV-675-LY, 2019 WL 2565280 (W.D. Tex. Apr. 2, 2019) .................14

*United States v. Stevens*,
691 F.3d 620 (5th Cir. 2012) .............................................................14

*United States v. Sutton*,
No. 2:23-CV-02100-SOH-MEF, 2024 WL 2926594 (W.D. Ark.
Mar. 27, 2024).................................................................................14

*United States v. WIYN Radio, Inc.*,
614 F.2d 495 (5th Cir. 1980) ...............................................23, 24, 25

**Statutes**

28 U.S.C. § 2462....................................................................................16

47 U.S.C. § 503...............................................................................22, 23

47 U.S.C. § 504....................................................................................15

**Regulatory Materials**

*Commission's Forfeiture Pol'y Statement & Amend. of Section 1.80 of
the Rules to Incorporate the Forfeiture Guidelines*, Report and
Order, 12 FCC Rcd 17087 (1997) ......................................................19

*Q Link Wireless LLC and Hello Mobile Telecom LLC*,
Notice of Apparent Liability for Forfeiture, 38 FCC Rcd 7022
(2023)..............................................................................................27

*Sprint Corporation*,
Forfeiture Order, FCC 24-42
(rel. Apr. 29, 2024) ....................................11, 12, 13, 15, 16, 17, 23, 24, 25, 26

*T-Mobile USA, Inc.*,
    Forfeiture Order, FCC 24-43
    (rel. Apr. 29, 2024) ........................................ …11, 12, 13, 15, 16, 17, 23, 25, 26

*TerraCom, Inc. and YourTel America, Inc.*,
    Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325
    (2014) ...........................................................................................................22, 26

*TerraCom, Inc., and YourTel America, Inc.*,
    Order, 30 FCC Rcd 7075 (July 9, 2015)............................................................22

**Other Authorities**

Sprint, Form 10-K (May 29, 2019), https://tinyurl.com/b2jmt6te...........................24

T-Mobile, Form 10-K (Feb. 7, 2019), https://tinyurl.com/bdhndyby.....................24

U.S. Const. amend. VII ................................................................................................8

# GLOSSARY

| | |
|---|---|
| DOJ | Department of Justice |
| FCC or Commission | Federal Communications Commission |
| SEC | Securities and Exchange Commission |
| Sprint Forfeiture Order | The forfeiture order imposed on Sprint in *Sprint Corporation*, Forfeiture Order, FCC 24-42 (rel. Apr. 29, 2024) |
| T-Mobile Forfeiture Order | The forfeiture order imposed on T-Mobile in *T-Mobile USA, Inc*., Forfeiture Order, FCC 24-43 (rel. Apr. 29, 2024) |

## INTEREST OF *AMICUS CURIAE*

The U.S. Chamber of Commerce is the world's largest business federation.[1] It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The Chamber has been engaged for years in legislative, regulatory, and litigation matters involving the collection and use of data by American businesses, which is regulated by a patchwork of federal and state laws. The Chamber has championed federal legislation to provide predictability and uniformity for businesses and consumers, and it has resisted agency overreach and regulation that creates uncertainty and duplicative obligations for U.S. businesses in the digital economy. At the same time, the Chamber has consistently sought to ensure that

---

[1] No counsel for any party authored this brief in whole or in part. No entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

federal regulatory agencies operate within the structural limitations of the Constitution.

In a pair of landmark Supreme Court decisions issued this past term, in which the Chamber participated as amicus, the Supreme Court vindicated important limits on federal agency action, including the right of citizens to have access to Article III courts and juries to adjudicate claims for civil penalties, *see SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), and the proper role of courts in determining the meaning of statutes and the scope of agency authority, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

This case implicates both Chamber priorities. In the agency proceedings giving rise to the petitions for review of T-Mobile and Sprint, the Federal Communications Commission ("FCC") abused its investigative and enforcement authority to violate the companies' Seventh Amendment right to a jury. And it announced and applied novel legal interpretations of the Communications Act to calculate and impose staggering forfeitures for activities that were not at the time of conduct a violation of any agency rule or law. The FCC's unpredictable and arbitrary enforcement procedure is inconsistent with orderly administrative process, the Communications Act, and the fundamental rights embodied in the Constitution.

## STATUTES AND REGULATIONS

All applicable statutes are contained in the Statutory Addendum to Petitioners' Brief.

## INTRODUCTION AND SUMMARY

The FCC's role in data privacy and security is limited to specific regulatory activities directed by Congress, such as the regulation of "customer propriety network information"—a statutorily defined term. But the FCC has under different administrations attempted to expand its limited statutory mandate to encompass reams of additional data—including an ill-fated attempt to adopt broadband privacy rules that Congress abrogated under the Congressional Review Act. In the absence of statutory authority to adopt rules to assert a more muscular role on privacy, the agency has at times turned to its Enforcement Bureau to establish new policies outside the strictures of notice-and-comment rulemaking. This approach has resulted in threatening regulated entities with crushing liability for novel violations, and obtaining consent decrees where a company acquiesces.

The investigative and enforcement process at the FCC is hardly a model of fairness and due process. The agency shares many of the same enforcement processes as the Securities and Exchange Commission, which this Court and the Supreme Court have found inconsistent with the Seventh Amendment.

In this case, the FCC initiated an investigation in response to press reports about location data sales. Five years later, the Commission in a divided vote approved controversial new legal standards and imposed massive civil penalties on T-Mobile, Sprint, and other carriers on the same day. The FCC used its claimed enforcement authorities to punish T-Mobile and Sprint for violations of regulatory standards that were newly announced by the agency in the very same proceeding. Neither T-Mobile nor Sprint has had an opportunity to test the agency's new legal theories, its methodology for assessing violations, or the calculation of the forfeitures before an Article III court. Nor have they had an opportunity to receive a jury trial on their liability or the amount of penalties.

The FCC's orders flagrantly violated the Constitution by depriving T-Mobile and Sprint of their rights to a neutral, Article III adjudicator and a jury. The Seventh Amendment provides that in "Suits at common law," "the right of trial by jury shall be preserved." As the Supreme Court recently explained in *SEC v. Jarkesy*, the text, history, and precedent of this provision emphatically dictate that before the federal government can impose a punitive fine like the ones here, the defendant has a right to an Article III judge and jury. But the FCC imposed its gargantuan fines through adjudication at the FCC in which the FCC gave itself the roles of judge, jury, and prosecutor.

In the orders, the FCC defended its administrative adjudication mainly with the same arguments the United States made in *Jarkesy*, which was then pending before the U.S. Supreme Court. But the Supreme Court has since decided *Jarkesy* and rejected those arguments. So, the FCC is now left to assert that its orders are saved by Section 504(a) of the Communications Act, which allows the Department of Justice ("DOJ") to sue in federal district court to collect unpaid penalties. Because Section 504(a) provides that a DOJ collection action shall include a trial *de novo*, the FCC says, T-Mobile and Sprint could have received the Seventh Amendment's protections by refusing to pay the penalties.

That argument fails many times over. *First*, its premise is incorrect: under this Court's law, district-court review in a DOJ collection action is extremely limited and deferential. *Second*, T-Mobile and Sprint could not be expected, nor should they have been forced, to refuse to pay what on its face is a binding government directive, nor do T-Mobile and Sprint have any control over whether DOJ will bring a collection action with its attendant procedural protections. *Third*, regardless whether T-Mobile and Sprint paid the penalties, the forfeiture orders themselves imposed legal, reputational, and economic harms on T-Mobile and Sprint from the moment they were adopted.

Moreover, even assuming arguendo the FCC's view of this case, Congress may not convert federal agencies into *de facto* district courts by assigning initial

adjudication to agencies with appellate review (even *de novo*) by the federal courts. *Jarkesy* forecloses that possibility: for common-law claims, it explains, "involvement by an Article III court *in the initial adjudication* is necessary."  144 S. Ct. 2117, 2132 (2024) (emphasis added).  Straightforward application of *Jarkesy* resolves this dispute.

The forfeiture orders also exceeded the FCC's statutory authority, as T-Mobile and Sprint explain.  For example, the FCC adopted an aggressive (to put it mildly) statutory reading that allowed it to circumvent a statutory damages cap. The Communications Act caps damages at a particular amount for each "single act or failure to act," but the FCC determined that T-Mobile had 73 and Sprint had 11 "single act[s] or failure to act[s]" because T-Mobile had relationships with 73 location-based service providers or aggregators and Sprint had relationships with 11 location-based service providers or aggregators.  The FCC further asserted that, because there was a violation with respect to each of T-Mobile's 79.7 million subscribers and Sprint's 54.4 million subscribers, there were actually 79.7 million "single act[s] or failure to act[s]" by T-Mobile and 54.4 million "single act[s] or failure[s] to act" by Sprint, and therefore it could have imposed a fine of $159.4 trillion on T-Mobile and a fine of $108.8 trillion on Sprint.  The FCC supported its absurd reading by invoking *Chevron* deference in all but name, without any

analysis of statutory text. Unsurprisingly, its policy-driven interpretive position does not reflect the statute's best reading.

This Court should vacate the FCC's forfeiture orders.

## ARGUMENT

## I. THE CONSTITUTION PROHIBITS THE FCC'S PROCESS FOR IMPOSING PENALTIES

The FCC imposed a $80 million penalty on T-Mobile and $12.2 million penalty on Sprint without any judicial process. Rather than making its case before an Article III judge and jury as the Constitution requires, the FCC made its case to itself, acting as the judge, jury, and prosecutor. As *Jarkesy* explains, that violates the Seventh Amendment because, when it comes to civil penalties like those at issue here, respondents have "the right to be tried by a jury of [their] peers before a neutral adjudicator." *Jarkesy*, 144 S. Ct. at 2139.

The FCC defended its framework with two arguments. First, the FCC argued that the public-rights exception permits its process. Second, the FCC argued that even if the public-rights exception does not apply, its process is constitutional because Section 504(a) allowed T-Mobile and Sprint to receive a trial *de novo* in a DOJ collection action. Both arguments fail. The Supreme Court's decision in *SEC v. Jarkesy*, published after the FCC issued the forfeiture orders in this case, directly repudiates the FCC's argument about the public-rights

exception.   And Section 504(a) does not eliminate the Seventh Amendment violation because T-Mobile and Sprint's constitutional rights cannot be conditioned on their refusal to comply with a forfeiture order, and the DOJ's discretionary decision on whether and when to collect.  The Constitution required the right to trial by jury at the outset, which T-Mobile and Sprint never received.

## A.     The Seventh Amendment Entitled T-Mobile and Sprint to A Jury Trial

The FCC cannot impose civil penalties on T-Mobile and Sprint without the protections of a trial by jury before a neutral arbitrator.  The Supreme Court in *Jarkesy* made that clear.   The Court there evaluated a Seventh Amendment challenge brought by an investment advisor and his firm to the SEC's attempt to impose civil penalties for securities fraud in its own in-house administrative tribunals.   Examining the text, history, and precedent underlying the Seventh Amendment, the Court concluded that the SEC could not impose its civil penalty remedy without the protections accorded by a federal court and jury.  The same result applies here.

The Seventh Amendment provides that in "[s]uits at common law, … the right of trial by jury shall be preserved."   U.S. Const. amend. VII.   Statutory claims—like the ones the SEC pursued in *Jarkesy* and those the FCC seeks here— are "suits at common law" if the claim at issue is "legal in nature."   144 S. Ct. at

2128.  While that inquiry can encompass both "the cause of action and the remedy it provides," "[s]ince some causes of action sound in both law and equity," the Supreme Court has historically "concluded that the remedy was the more important consideration." *Id.* at 2129 (cleaned up).

In these cases, as in *Jarkesy*, "the remedy is all but dispositive," because the FCC (like the SEC) "seeks civil penalties" that are "designed to punish or deter the wrongdoer." *Id.*  They fall within the core of remedies that implicate the jury right and can "only be enforced in courts of law." *Id.*

There can be no doubt that the remedy at issue here is a civil penalty designed to punish or deter T-Mobile and Sprint.  The government itself observed as much earlier this year, stating that an FCC forfeiture penalty "is a civil penalty" that is "plainly punitive in nature."  United States Br. 12, *United States v. Rhodes*, No. 21-cv-0110 (D. Mont. Mar. 1, 2024), ECF No. 108.  It involves a "per-violation maximum penalty," and "is designed to punish culpable individuals, rather than to extract compensation or restore the status quo." *Id.* (cleaned up).  That is game, set, and match—the government's acknowledgment that FCC forfeiture penalties are punitive "effectively decides that this suit implicates the Seventh Amendment right, and that a defendant would be entitled to a jury on these claims." *Jarkesy*, 144 S. Ct. at 2130.

To be sure, the Supreme Court in *Jarkesy* "confirm[ed] that conclusion" by identifying a "close relationship" between the securities fraud claim at issue there and common-law fraud. *Id.* The same type of "close relationship" exists here. As T-Mobile and Sprint have shown, common-law analogues that cover "the same basic conduct" (*id.*) as the FCC's forfeiture orders abound—from negligence to an action in debt. *See* Pet. Br. 31-32, ECF No. 2086713. But even if these analogues bore less resemblance to the FCC's claims than the analogues at issue in *Jarkesy*, the result would be the same. After all, the Court's focus on remedy as "all but dispositive" establishes a strong presumption that a claim for civil penalties designed to punish or deter is legal in nature. As was true in *Jarkesy*, the mere fact that a statutory cause of action has no "identical" common-law equivalent cannot overcome that presumption. 144 S. Ct. at 2131.

To try to evade the Seventh Amendment, the FCC attempts to fit these cases into a narrow exception that allows for administrative adjudication of "public rights." But that exception fails on its own terms. In *Jarkesy*, the Court noted that it had never "definitively explained" the line between public and private rights, and that the public rights exception was an "area of frequently arcane distinctions and confusing precedents." *Id.* at 2133. But the Court noted that the exception "has no textual basis in the Constitution" and must be applied "with care," or else "the exception would swallow the rule." *Id.* at 2134. Accordingly, the Court has

required significant historical warrant for the conclusion that the Constitution permits administrative adjudication in a specific area, like "an unbroken tradition—long predating the founding" of using summary proceedings to collect tax revenue. *Id.* at 2132. But none of the "historic categories of adjudications" the Court identified—like relations with Indian tribes, administration of public lands, or payments to veterans or pensions (*id.* at 2133)—remotely apply here. There are no "centuries-old rules" (*id.* at 2134) that would permit the FCC to adjudicate these claims, which are in the nature of an action at common law, and seek civil penalties in an administrative tribunal.

Resisting this conclusion, the FCC makes the same arguments that the SEC made in *Jarkesy* and the Supreme Court rejected. It leans heavily on *Atlas Roofing Co. v. OSHA*, 430 U.S. 442 (1977), a nearly 50-year-old case sustaining administrative adjudication under the OSH Act for certain workplace safety claims. *T-Mobile USA, Inc.*, Forfeiture Order, FCC 24-43 ¶ 104 (rel. Apr. 29, 2024) (citing *Atlas Roofing* six times in a single paragraph) ("T-Mobile Forfeiture Order"); *Sprint Corporation*, Forfeiture Order, FCC 24-42 ¶ 81 (rel. Apr. 29, 2024) (same) ("Sprint Forfeiture Order"); *see generally* SEC Br., *SEC v. Jarkesy*, No. 22-859, 2023 WL 5655520 (U.S. Aug. 28, 2023). But the Supreme Court in *Jarkesy* came less to praise *Atlas Roofing* than to bury it. Beyond asserting that the precedent did not control where, as here, the claim is in the nature of a common law suit, 144 S.

Ct. at 2133, the Court went on to explain that *Atlas Roofing* "represents a departure from our legal traditions," that scholars have often either "simply ignored the case" or "offered nothing but a variety of criticisms," and that later precedent clarified the limits of *Atlas Roofing*'s holding and may indeed have overruled the case. *Id.* at 2138 n.4; *see also id.* at 2137 n.3 (noting that "the author of *Atlas Roofing* certainly thought that" later Supreme Court precedent "may have" overruled the case). Needless to say, a case that represents a departure from our legal traditions, offered circular reasoning for its holding, and may already be overruled does not provide a sufficient basis to deprive T-Mobile and Sprint of their Seventh Amendment right—especially after the Supreme Court cautioned that even in close cases, "the presumption is in favor of Article III courts." *Id.* at 2134 (cleaned up).

In any event, the Court explicitly rejected the broader readings of the case advanced by the FCC here. Like the SEC in *Jarkesy*, the FCC argues that the public-rights exception applies because Congress "created new statutory obligations" and assigned their enforcement to executive adjudication. T-Mobile Forfeiture Order ¶ 104; Sprint Forfeiture Order ¶ 81; SEC Br., 2023 WL 5655520, at *13 (public-rights doctrine "permits Congress to create 'new statutory obligations,' impose civil penalties for their violation, and commit to an administrative agency the function of deciding whether a violation has in fact occurred" (cleaned up)). But the *Jarkesy* Court expressly rejected the argument

that the public-rights exception applies merely because "Congress created 'new statutory obligations'" and "imposed civil penalties for their violation." 144 S. Ct. at 2136 (cleaned up).

## B. Section 504(a) Does Not Save The FCC's Approach to Imposing Forfeitures

With its public-rights argument rejected by *Jarkesy*, the FCC is left with only its argument from Section 504(a). That provision allows DOJ to sue in federal district court to collect unpaid FCC forfeiture penalties. The FCC argues that Section 504(a) makes its enforcement process constitutional. That argument fails for multiple independent reasons.

### 1. There Are No Section 504(a) De Novo Jury Trials

The FCC's first problem is that its premise is incorrect. By the FCC's own reckoning, no Section 504(a) jury trial has occurred in at least fifty years—the FCC has cited only one 1974 case from a different circuit in which a jury trial "was available" but was waived. T-Mobile Forfeiture Order ¶ 97 n.315; Sprint Forfeiture Order ¶ 74 n.248. The FCC does not point to a single actual Section 504(a) jury trial ever, and a search of cases citing Section 504(a) suggests that there has never been one. Any jury trial right appears theoretical at best.

Even if a Section 504(a) jury trial ever does occur, moreover, under current law a defendant may not actually receive de novo review of the law or facts. *See*

Pet. Br. 35-36, ECF No. 2086713 (collecting authorities). Some district courts have noted that review under Section 504(a) is "extremely limited." *United States v. Olenick*, No. 18-CV-675-LY, 2019 WL 2565280, at \*3 (W.D. Tex. Apr. 2, 2019) (default judgment against defendant), *adopted*, 2019 WL 3818041, at \*1 (W.D. Tex. May 14, 2019). Courts have reviewed the FCC's factfinding, for example, deferentially for reasonableness. *See United States v. Sutton*, No. 2:23-CV-02100-SOH-MEF, 2024 WL 2926594, at \*12 (W.D. Ark. Mar. 27, 2024) (government's motion for judgment on the pleadings) ("[C]ourts have held that an FCC forfeiture penalty should be upheld where the amount is reasonable and consistent with the relevant FCC guidelines."). Multiple courts of appeals, meanwhile, have held that legal challenges are generally not available at all. *See United States v. Stevens*, 691 F.3d 620, 622 (5th Cir. 2012) (bench trial) (affirming district court's "refus[al] to consider the Stevenses' legal arguments" because "its jurisdiction was limited to considering the factual basis for the agency action"); *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000) (government's motion for judgment on the pleadings) (similar); *United States v. Dunifer*, 219 F.3d 1004, 1008 n.8 (9th Cir. 2000) (bench trial) (similar). Under our Constitution, "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see also Loper Bright*, 144 S. Ct. at 2273 (judges must

14

use "independent judgment"). But if Section 504(a) review is the judicial process an enforcement target receives, the executive—and the executive only—has said what the law is. T-Mobile and Sprint should not have to abdicate their Article III right to have an impartial decisionmaker interpret the law to vindicate their Seventh Amendment right to a jury.

## 2. The Forfeiture Orders Compelled Payment

Even if Section 504(a) review did amount to *de novo* review, there was no way for T-Mobile or Sprint to guarantee they could obtain it. The FCC argues that Section 504(a) gave T-Mobile and Sprint a "statutory right" to Section 504(a) review. T-Mobile Forfeiture Order ¶ 97 n.315; Sprint Forfeiture Order ¶ 74 n.248; *see also* T-Mobile Forfeiture Order ¶ 97 (T-Mobile was "entitled" to Section 504(a) review); Sprint Forfeiture Order ¶ 74 (Sprint was "entitled" to Section 504(a) review). That is wrong.

Section 504(a) does not grant any rights to regulated entities; rather, it empowers DOJ to institute a collection action in certain circumstances. Section 504(a) is titled "Recovery." It provides that FCC forfeitures "shall be recoverable … in a civil suit in the name of the United States brought in [federal district court]." 47 U.S.C. § 504(a). Nothing in Section 504(a) entitles an FCC defendant to refuse to pay penalties or demand an Article III court and jury in the event it fails to do so. Section 504(a) simply enables DOJ to sue for the funds

when a defendant does not pay its debt. Should DOJ decide not to collect, T-Mobile and Sprint would have no mechanism to assert their constitutional rights. And they certainly would have no control over how quickly they can vindicate themselves before judge and jury, as the DOJ could take up to five years to bring a collection action under the applicable statute of limitations. *See* 28 U.S.C. § 2462.

Furthermore, nothing about the FCC's forfeiture orders suggests that T-Mobile and Sprint might be "entitled" to disregard them. The orders were titled "Forfeiture Order," not "Forfeiture Suggestion." T-Mobile Forfeiture Order at 1; Sprint Forfeiture Order at 1. The orders were "[b]y the Commission." T-Mobile Forfeiture Order at 1; Sprint Forfeiture Order at 1. In the first paragraph, the Commission wrote that "we … impose a penalty of $80,080,000 against T-Mobile," T-Mobile Forfeiture Order ¶ 1, and "we … impose a penalty of $12,240,000 against Sprint." Sprint Forfeiture Order ¶ 1. The T-Mobile order states: "**IT IS ORDERED**" that T-Mobile "**IS LIABLE FOR A MONETARY FORFEITURE** in the amount of … $80,080,000." T-Mobile Forfeiture Order ¶ 109. The orders state that "[p]ayment of the forfeiture shall be made … within thirty (30) calendar days." *Id.* ¶ 110; Sprint Forfeiture Order ¶ 87. And T-Mobile and Sprint "shall send electronic notification," the orders continue, upon payment. T-Mobile Forfeiture Order ¶ 110; Sprint Forfeiture Order ¶ 87.

Needless to say, that is language of coercion. The orders tell T-Mobile and Sprint what they "shall" do. *See, e.g.*, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("shall" is "mandatory" and "creates an obligation"). And they require T-Mobile and Sprint to do it promptly. Despite all the orders' emphatic commands, astoundingly, the FCC says that any payment by T-Mobile or Sprint was made "voluntarily." T-Mobile Forfeiture Order ¶ 97 n.315; Sprint Forfeiture Order ¶ 74 n.248. That is Orwellian nonsense. The forfeiture orders' plain language leaves no doubt that payment was required.

To be sure, one consequence of T-Mobile and Sprint's timely payment of the forfeitures is that they can avail themselves of the Communications Act's ordinary processes for appeal to a federal court of appeals for final Commission orders. *See AT&T Corp. v. FCC*, 323 F.3d 1081, 1083-84 (D.C. Cir. 2003) (citing 47 U.S.C. § 504(a)). But that is simply to say T-Mobile and Sprint incur no additional penalty for complying with the FCC's orders. Had T-Mobile and Sprint refused to pay, that judicial review mechanism would disappear, and T-Mobile and Sprint would have been left at the mercy of DOJ to initiate process under the Communications Act's special provision for collection of "recoverable" debts. *See id.* at 1084 (construing 47 U.S.C. § 504(a)). And of course, neither judicial review provision *entitles* T-Mobile or Sprint to demand a trial by jury.

### 3. The Forfeiture Orders Immediately Harmed T-Mobile and Sprint

The difference between a trial initiated in an Article III court and a DOJ collection action (following an informal proceeding in an in-house tribunal and forfeiture order) is not merely semantic. It is embedded in the constitutional design, and for good reason, because it protects targets of enforcement actions from being unilaterally deemed a lawbreaker in an invalid and unfair procedure, and from facing the legal, reputational, and economic harms that come from a finding of liability in that proceeding. The FCC's claim of "no harm, no foul" if the DOJ fails to pursue a forfeiture penalty imposed by the agency cannot withstand scrutiny.

*First*, the forfeiture orders constitute an official government determination that the enforcement target is a lawbreaker. But only the judiciary, not the executive, has the power to make such a determination with respect to claims for civil penalties. To be sure, the Executive Branch may use administrative adjudication to determine whether to *prosecute* a defendant. But with respect to "common law claims," as the Court explained in *Jarkesy*, "involvement by an Article III court *in the initial adjudication* is necessary." 144 S. Ct. at 2132 (emphasis added). That requirement was not satisfied here, where the initial adjudication was made by an in-house agency tribunal.

*Second*, the FCC's in-house determinations carry significant legal consequences. Under FCC policy, the agency may "us[e] the underlying facts of a prior violation that shows a pattern of non-compliant behavior against a licensee in a subsequent renewal, forfeiture, transfer, or other proceeding."[2] That means the FCC could use the facts supporting an unpaid forfeiture "as a basis for a higher forfeiture" in future cases. FCC Policy Statement ¶ 35; *see also FCC v. Fox Television Stations*, 567 U.S. 239, 255 (2012) (noting FCC's authority to take "history of prior offenses" into account when setting a future forfeiture penalty, even where agency declines to impose forfeiture initially) (citing 47 U.S.C. § 503(b)(2)(E)). And by the FCC's own admission, such facts apparently could also serve as a basis for denying a request to renew a license for broadcast, mobile voice or broadband, or satellite services; to prevent consummation of a merger that involved the transfer of FCC licenses; or to inform the FCC's determination of whether a company possesses the requisite character to hold licenses at all—as the FCC's invocation of "other proceeding" appears limitless. *See* FCC Policy Statement ¶ 34. It is cold comfort to a licensee faced with such a legal cloud surrounding its operations that the facts adjudicated by the agency may someday

---

[2] *See Commission's Forfeiture Pol'y Statement & Amend. of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 FCC Rcd 17087, ¶ 34 (1997) ("FCC Policy Statement").

be subject to review, at the executive branch's discretion, by an Article III court and jury.

*Third*, the pendency of forfeiture orders carries with it significant reputational and economic harms. As the Supreme Court has noted, FCC orders impose "reputational injury" in addition to "legal consequence." *Fox Television Stations*, 567 U.S. at 255. The agency's "findings of wrongdoing can result in harm to a broadcaster's reputation with viewers and advertisers," for example, given the "strongly disapproving terms" that "are contained in the permanent Commission record," and the fact that such findings are "widely publicized." *Id.* at 255-56 (cleaned up). Meanwhile, enforcement targets must determine whether the existence of the forfeiture order or the findings contained therein must be further disclosed to investors as material in filings with the SEC; or in potential applications for new government contracts, grants, or similar programs or benefits; or in applications for new lines of credit or similar funding. These reputational and economic harms would exist even if (indeed, especially if) the DOJ makes no attempt to test the agency's allegations or conclusions in federal court.

*Fourth*, and finally, the procedures at play at the agency and in a DOJ collection action contribute to the costs imposed on enforcement targets throughout the process. Unlike in federal court, which has established timeframes for responding to a complaint, and where an Article III judge manages the timing and

scope of the discovery process, there are no similar safeguards at the FCC. An FCC investigation and enforcement action can linger for years without resolution; indeed, in the orders under review, it took five years from the initiation of an investigation until the FCC issued its forfeiture orders against T-Mobile and Sprint. And should a target eventually get to federal court, it has to start the process all over again—incurring unnecessarily duplicative costs and further drawing out resolution. Even then, the target is branded with being a defendant in a "collection" action for a forfeiture already imposed, often, as noted above, with diminished procedural safeguards.

For all the above reasons, Section 504(a) review cannot bear the weight the FCC assigns to it. Because of the significant legal and real-world consequences FCC forfeiture orders impose on parties like T-Mobile and Sprint, the FCC cannot impose civil penalties without the protections of an Article III court and jury.

## II. THE FCC'S INTERPRETATION OF THE STATUTE TO PERMIT THE IMPOSITION OF UNPREDICTABLE AND MASSIVE CIVIL PENALTIES IS PLAINLY WRONG

The FCC has long exploited *Chevron* deference to create and apply unclear regulatory standards for assessing and calculating civil penalties. The FCC has claimed for itself substantial discretion to determine virtually every element of a civil penalty: the number and type of violations that occurred in a given case, how to apply forfeitures to those claimed violations, whether to apply upward

adjustments, and more.  This unpredictable and standardless exercise of authority

has enabled the FCC's Enforcement Bureau to threaten regulated entities with

exorbitant penalties to secure consent decrees and behavioral commitments it could

not otherwise obtain.  *See, e.g.*, *TerraCom, Inc. and YourTel America, Inc.*, Notice

of Apparent Liability for Forfeiture, 29 FCC Rcd 13325, ¶ 52 (2014) (claiming,

over two dissents, the ability to impose a $9 billion forfeiture)  ("TerraCom

NAL"); *TerraCom, Inc., and YourTel America, Inc.*, Order, 30 FCC Rcd 7075, ¶ 4

(July 9, 2015) ("To settle this matter, TerraCom and YourTel will pay a civil

penalty of $3,500,000").

These cases involving T-Mobile and Sprint illustrate the problem.[3]  Section

503(b) provides that a person may be liable for forfeiture for "willfully or

repeatedly fail[ing] to comply with any of the provisions of" the Communications

Act or rules promulgated by the FCC.  47 U.S.C. § 503(b)(1)(B).  The Act then

caps the total per-violation amount at approximately $200,000 for "each violation

or each day of a continuing violation, except that the amount assessed for any

continuing violation shall not exceed" approximately $2 million, numbers adjusted

for inflation, "for any single act or failure to act" that violates the statute or FCC

---

[3] While the Chamber focuses discussion on the FCC's interpretation of Section
503(b)(2)(B), the Chamber supports T-Mobile and Sprint's other statutory
arguments as well.

rules.  *Id.* § 503(b)(2)(B).  The import of this provision is clear: while a "continuing violation" of FCC rules, based on a "single act or failure to act," may increase a violator's penalties beyond a single forfeiture, the penalties for a single "continuing violation" may not in the aggregate exceed $2 million.

The continuing violation provision "subjects to separate liability the recurring daily episodes of a delictual pattern that might otherwise be treated in the aggregate"—such as operating a broadcast station each day for 14 consecutive days without a license.  *United States v. WIYN Radio, Inc.*, 614 F.2d 495, 497 (5th Cir. 1980).  It does not penalize, by mere passage of time, the "fail[ure] to fulfill … a single, pointed duty, admitting of only a single dereliction," even if "the effect of [the] failure to act within the prescribed period persists."  *Id.*  Nor, by extension, does it permit the agency to identify tens, hundreds, or even millions of separate continuing violations based on a single failure to perform a legal duty.

Here, the Commission's findings in the forfeiture orders could support at most a single "failure to act" warranting a forfeiture—that T-Mobile and Sprint purportedly "failed to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information."  T-Mobile Forfeiture Order ¶ 45; Sprint Forfeiture Order ¶ 46.  But the FCC found *73* separate violations by T-Mobile and *11* separate violations by Sprint—not grounded in additional "acts" or "failure[s] to act" committed by T-Mobile and

Sprint, but instead based on each location-based service provider that T-Mobile and Sprint did business with. And as the FCC saw it, that was conservative.

According to the Commission, it "could well have chosen to look to the total number of T-Mobile and Sprint subscribers when determining the number of violations." *Id.* ¶ 80. As of December 31, 2018, T-Mobile had 79.7 million wireless subscribers. T-Mobile, Form 10-K (Feb. 7, 2019), https://tinyurl.com/bdhndyby. As of March 2019, Sprint had 54.4 million subscribers. Sprint, Form 10-K (May 29, 2019), https://tinyurl.com/b2jmt6te. Taking the agency at its word, using those numbers and multiplying them by the approximately $2 million per-violation cap equals $159.4 trillion and $108.8 trillion, respectively. That is not a typo, and it is the amount the FCC says it could have fined T-Mobile and Sprint under Section 503. It is more than double the entire world's GDP. An interpretation that allows this "ludicrous … result[]" and that would permit the FCC to regulate in such "draconian fashion" cannot possibly be what Congress had in mind when enacting a *cap* on damages. *WIYN Radio*, 614 F.2d at 497-98.

Apart from the unbounded authority it would provide the FCC, under the agency's construction "willfulness would effectively be eliminated as a predicate for forfeiture." *Id.* at 498. Each day following a single failure to exercise due care—or in the Commission's reading, each separate location-based service

24

provider or subscriber implicated in that failure to act—would be converted automatically into a new rules violation, regardless of whether there was willfulness associated with each business partner or subscriber or "sheer inadvertence." *Id.*

In the forfeiture orders, the FCC did not support its atextual and absurd position by invoking any tool of statutory interpretation that could shed light on Section 503(b)(2)(B)'s meaning. Rather, the FCC invoked *Chevron* deference. The FCC did not call it that, of course—the FCC knew well that *Chevron* was on life support. But the FCC's arguments unmistakably rely on that since-overruled doctrine.

The FCC began by asserting that Section 503(b)(2)(B) does not "speak to" "the application of the phrase 'single act or failure to act.'" T-Mobile Forfeiture Order ¶ 78; Sprint Forfeiture Order ¶ 65. That is *Chevron* language—the first step of *Chevron* was determining whether Congress has "spoken to" the question. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984). The FCC then asserted that its 73-violations determination and 11-violations determination were "reasonabl[e]." T-Mobile Forfeiture Order ¶ 79 (determination was "rational and properly within the Commission's discretion"); Sprint Forfeiture Order ¶ 66 (same). That was *Chevron*'s second step—determining whether the agency's interpretation was "reasonable." *Chevron*, 467 U.S. at 844.

25

But "*Chevron* is overruled." *Loper Bright*, 144 S. Ct. at 2273. Now, a court's only job is to exercise its "independent judgment" to decide whether the agency "has acted within its statutory authority." *Id.* The FCC's days of stretching statutory language and falling back on deferential review are over.

The Commission did not have "discretion," T-Mobile Forfeiture Order ¶ 79, when determining the meaning of "single act or failure to act." This case does not implicate one of the narrow circumstances in which Congress might "expressly delegate" discretion to an agency, for example, by using broad language "such as 'appropriate' or 'reasonable.'" *See Loper Bright*, 144 S. Ct. at 2263. The phrase "single act or failure to act" contains plain English words subject to judicial review and interpretation—as this Court has done in the past.

This is not the only case in which the FCC has taken a freewheeling, policy-driven approach to determining what counts as a violation under Section 503, instead of interpreting the statute. The FCC's *TerraCom* NAL, for example, which the FCC cited in the forfeiture orders here, took a different approach to finding violations and identified each unprotected *document* as a separate violation. *See* T-Mobile Forfeiture Order ¶ 79; Sprint Forfeiture Order ¶ 66; TerraCom NAL at 13350 (threatening $9 billion in fines); *see also id.* (Commissioner Pai dissenting) ("It strains credulity to think that Congress intended such massive potential liability for 'telecommunications carriers' but not retailers or banks or insurance

26

companies or tech companies or cable operators or any of the myriad other businesses that possess consumers' [personal identifying information]."). The FCC's other forays into data security and privacy reveal still different approaches, contributing to confusion and illustrating the arbitrariness of the FCC's approach. *See, e.g.*, *Q Link Wireless LLC and Hello Mobile Telecom LLC*, Notice of Apparent Liability for Forfeiture, 38 FCC Rcd 7022, ¶ 30 (2023) (concluding that "each time the Companies used readily available biographical information or account information either to authenticate a customer or carry out a password reset—whether on the Website or via the App—constitutes a separate violation of … the Commission's rules").

Aside from having no basis in the statute, the FCC's new theory of "single act or failure to act" also violates the requirement of fair notice. Regulated parties "need fair notice of the circumstances" in which they "will and will not" be subject to adverse agency action. *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1046 (D.C. Cir. 2017); *see also, e.g.*, *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (fair notice of what the law "either forbids or requires" is "the first essential of due process of law"). While the fair-notice requirement has roots in constitutional due process, it "has now been thoroughly 'incorporated into administrative law.'" *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995); *Satellite Broad. Co., Inc. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987) (enforcing

fair-notice requirement is form of arbitrary-and-capricious review). "[A]n agency cannot sanction an individual for violating the agency's rules unless the individual had 'fair notice' of those rules." *SNR Wireless LicenseCo, LLC*, 868 F.3d at 1043; *see also Howmet Corp. v. EPA*, 656 F. Supp. 2d 167, 173 (D.C. Cir. 2009) ("A party may not be penalized for violating a regulation when that party has not received fair and adequate notice of what the regulation requires."); *Gen. Elec. Co.*, 55 F.3d at 1328-29 ("In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability."). But here T-Mobile and Sprint had no notice that every relationship with a location-based service provider or aggregator left in place thirty days after the *New York Times* article the FCC cites would be deemed a separate violation. That makes the forfeiture orders arbitrary and capricious.

In sum, the FCC's policy-driven and atextual approach deprives targets of fair notice, and disregards the plain text of the statute. Congress enacted the Administrative Procedure Act "as a check upon administrators whose zeal" has "carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 144 S. Ct. at 2261. The FCC's approach in this case is exactly what Congress had in mind.

## CONCLUSION

This Court should vacate the forfeiture orders.

Dated: December 2, 2024

Respectfully submitted,

*/s/* Mariel A. Brookins
  *Counsel of Record*
Maria C. Monaghan
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 659-6000
mbrookins@USChamber.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), this brief contains 6,540 words as calculated by the word-processing function.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced 14-point Times New Roman font using Microsoft Word.

Additionally, this brief complies with D.C. Circuit Rule 32(b)(1) because when electronically filed in PDF format, the document was generated from the original word-processing file and is fully text searchable.


Dated: December 2, 2024                    */s/* Mariel A. Brookins

**CERTIFICATE OF SERVICE**

I certify that on December 2, 2024, a true and correct copy of this Brief of *Amici Curiae* was filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

Dated: December 2, 2024                    /s/ Mariel A. Brookins

# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

**333 Constitution Avenue, NW**
**Washington, DC 20001-2866**
**Phone: 202-216-7000 | Facsimile: 202-219-8530**

**Case Caption:** Sprint Corporation

**v.**
FCC; United States of America

**Case No:** Nos. 24-1224, 24-1225

## ENTRY OF APPEARANCE

The Clerk shall enter my appearance as ○ Retained ○ Pro Bono ○ Appointed (CJA/FPD) ○ Gov't counsel

for the ○ Appellant(s)/Petitioner(s) ○ Appellee(s)/Respondent(s) ○ Intervenor(s) ◉ Amicus Curiae below:

### Party Information
*(List each represented party individually - Use an additional blank sheet as necessary)*

Chamber of Commerce of the United States

### Counsel Information

Lead Counsel: Mariel A. Brookins

Direct Phone: ( 202 ) 659-6000  Fax: (____) ____-____  Email: mbrookins@USChamber.com

2nd Counsel:

Direct Phone: (____) ____-____  Fax: (____) ____-____  Email:

3rd Counsel:

Direct Phone: (____) ____-____  Fax: (____) ____-____  Email:

Firm Name:  U.S. Chamber Litigation Center

Firm Address: 1615 H Street, NW Washington, DC 20062

Firm Phone: ( 202 ) 659-6000  Fax: (____) ____-____  Email:

Notes: This form must be submitted by a member of the Bar of the U.S. Court of Appeals for the D.C. Circuit.
**Names of non-member attorneys listed above will not be entered on the court's docket.** Applications for
admission are available on the court's web site at http://www.cadc.uscourts.gov/.