# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SPRINT CORPORATION,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

T-MOBILE USA, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

On Petitions For Review Of Forfeiture Orders In
*In re Sprint Corp.*, File No. EB-TCD-18-00027700, FCC 24-42; and
*In re T-Mobile USA, Inc.*, File No. EB-TCD-18-00027702, FCC 24-43

## PETITIONERS' REPLY BRIEF

Helgi C. Walker
Russell B. Balikian
Zachary E. Tyree
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
hwalker@gibsondunn.com
rbalikian@gibsondunn.com
(202) 955-8500

*Counsel for Petitioners*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ii

GLOSSARY ..............................................................................................vii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................1

ARGUMENT ..............................................................................................5

I.   The Orders Violate The Seventh Amendment And Article III .......5

    A.   Civil Penalties Require A Jury Trial In An Article III Court ...........................................................................5

    B.   A Possible Section 504(a) Collection Action Does Not Cure The Problem ...................................................10

    C.   The Public-Rights Exception Does Not Apply ......................13

II.  The Orders Exceed The FCC's Statutory Authority.....................16

    A.   The "Location" Component Of CPNI Covers Only Call-Location Information ......................................16

    B.   The Location Information Was Not Made Available "Solely By Virtue Of The Carrier-Customer Relationship" ..........................................................23

III. The Orders Violate Principles Of Fair Notice................................26

IV.  The Orders Are Arbitrary And Capricious Because The Companies Employed Reasonable Protective Measures ..............27

V.   The FCC's Penalties Are Unlawful And Arbitrary........................32

    A.   The Penalties Exceed The Statutory Maximum...................32

    B.   The Penalties Are Arbitrary And Disproportionate.............33

CONCLUSION ........................................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Action for Children's Television v. FCC,*
   59 F.3d 1249 (D.C. Cir. 1995) ............................................................ 12

*Ams. for Beneficiary Choice v. HHS,*
   2024 WL 3297527 (N.D. Tex. July 3, 2024) ...................................... 27

*Art Metal-U.S.A., Inc. v. United States,*
   753 F.2d 1151 (D.C. Cir. 1985) .............................................................. 9

*AT&T Corp. v. FCC,*
   323 F.3d 1081 (D.C. Cir. 2003) .................................................... 10, 12

*Carpenter v. United States,*
   585 U.S. 296 (2018) ............................................................................ 21

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ............................................................................ 29

*Collins v. SEC,*
   736 F.3d 521 (D.C. Cir. 2013) ............................................................ 34

*Crowell v. Benson,*
   285 U.S. 22 (1932) .............................................................................. 14

*Dubin v. United States,*
   599 U.S. 110 (2023) ............................................................................ 20

*Facebook, Inc. v. Duguid,*
   592 U.S. 395 (2021) ............................................................................ 20

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ............................................................................ 27

*Friedman v. Sebelius,*
   686 F.3d 813 (D.C. Cir. 2012) ...................................................... 33, 34

*Garvey v. Admin. Rev. Bd.*,
  56 F.4th 110 (D.C. Cir. 2022) ............................................................... 29

*Ill. Citizens Comm. for Broad. v. FCC*,
  515 F.2d 397 (D.C. Cir. 1974) ............................................................... 13

*Lillie v. Thompson*,
  332 U.S. 459 (1947) ................................................................................. 7

*Lockhart v. United States*,
  577 U.S. 347 (2016) .......................................................................... 18, 19

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ............................................................................... 27

*In re MCP No. 185*,
  124 F.4th 993 (6th Cir. 2025) .......................................................... 22, 24

*Meeker v. Lehigh Valley R.R. Co.*,
  236 U.S. 412 (1915) ............................................................................... 15

*Munn v. Illinois*,
  94 U.S. 113 (1877) ................................................................................. 14

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  59 U.S. (18 How.) 272 (1856) ............................................................... 12

*Nissan Chem. Corp. v. FDA*,
  2024 WL 3724686 (D.D.C. Aug. 8, 2024) ............................................ 27

*Ohio v. EPA*,
  603 U.S. 279 (2024) ............................................................................... 28

*Paroline v. United States*,
  572 U.S. 434 (2014) ............................................................................... 19

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ............................................................................... 13

*Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*,
  998 F.3d 999 (D.C. Cir. 2021) ................................................ 29

*Pichler v. UNITE*,
  542 F.3d 380 (3d Cir. 2008) .................................................. 8

*Primrose v. W. Union Tel. Co.*,
  154 U.S. 1 (1894) .......................................................... 7, 8

*S. Express Co. v. Caldwell*,
  88 U.S. (21. Wall.) 264 (1875) ............................................... 8

*Salazar v. NBA*,
  118 F.4th 533 (2d Cir. 2024) ................................................. 8

*SEC v. Gerasimowicz*,
  9 F.Supp.3d 378 (S.D.N.Y. 2014) ............................................. 6

*SEC v. Jarkesy*,
  603 U.S. 109 (2024) .................................. 1, 5, 6, 7, 8, 9, 10, 12, 14, 15

*Trinity Broad. of Fla., Inc. v. FCC*,
  211 F.3d 618 (D.C. Cir. 2000) ............................................... 27

*Tull v. United States*,
  481 U.S. 412 (1987) ........................................................ 6

*U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*,
  489 U.S. 749 (1989) ........................................................ 8

*United States v. Bass*,
  404 U.S. 336 (1971) ....................................................... 19

*Wilkinson v. Garland*,
  601 U.S. 209 (2024) ....................................................... 29

*Withrow v. Larkin*,
  421 U.S. 35 (1975) ........................................................ 15

**STATUTES**

15 U.S.C. § 77t ............................................................ 6

15 U.S.C. § 78u ........................................................... 6

18 U.S.C. § 2252 ........................................................ 19

47 U.S.C. § 153 ..................................................... 17, 24

47 U.S.C. § 222(a) ............................................. 9, 11, 27

47 U.S.C. § 222(d) ....................................... 16, 18, 22, 23

47 U.S.C. § 222(f) ........................................ 16, 18, 22, 23

47 U.S.C. § 222(h) ................................ 2, 16, 17, 18, 19, 20, 23, 24, 25, 26

47 U.S.C. § 402 .......................................................... 12

47 U.S.C. § 503 ..................................................... 29, 32

47 U.S.C. § 504 ............................................. 1, 2, 10, 11, 12

**REGULATIONS & ADMINISTRATIVE ORDERS**

47 C.F.R. § 64.2010 ........................................ 4, 7, 28, 30

*Implementation of the Telecomms. Act of 1996: Telecomms.*
    *Carriers' Use of Customer Proprietary Network Info. &*
    *Other Customer Info.,*
    22 FCC Rcd 6927 (2007) ..................................... 17, 21

*Implementation of the Telecomms. Act of 1996: Telecomms.*
    *Carriers' Use of Customer Proprietary Network Info. &*
    *Other Customer Info,*
    28 FCC Rcd 9609 (2013) ..................................... 17, 21

**OTHER AUTHORITIES**

19 Cong. Rec. 5150 (1888) ...................................... 15

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................................................................ 19

# GLOSSARY

| | |
|---|---|
| *2007 CPNI Order* | *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 6927 (2007) |
| *2013 CPNI Ruling* | *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, Declaratory Ruling, 28 FCC Rcd 9609 (2013) |
| Act | The Communications Act of 1934 |
| Companies | Petitioners T-Mobile USA, Inc. and Sprint Corp. |
| CPNI | Customer Proprietary Network Information |
| FCC or Commission | Federal Communications Commission |
| ICC | Interstate Commerce Commission |
| LBS | Location-Based Service |
| NAL | Notice of Apparent Liability |
| Orders | The forfeiture orders imposed on the Companies in *In re Sprint Corp.*, File No. EB-TCD-18-00027700, FCC 24-42 (released Apr. 29, 2024), and *In re T-Mobile USA, Inc.*, File No. EB-TCD-18-00027702, FCC 24-43 (released Apr. 29, 2024) |

# INTRODUCTION AND SUMMARY OF ARGUMENT

The FCC's Orders should be vacated as unconstitutional, unlawful, and arbitrary and capricious. The agency's response brief confirms that conclusion.

*First*, the FCC has no answer to the Supreme Court's holding in *SEC v. Jarkesy*, 603 U.S. 109 (2024), that civil penalties are a quintessential remedy at law. The punitive nature of the penalties imposed "effectively decides" that a jury trial was required under the Seventh Amendment and Article III. *Id.* at 125. The FCC argues that its statutory claim is not analogous to a common-law suit, but *Jarkesy* makes clear that a claim's statutory origin is no basis to withhold a jury trial, and the FCC ignores a long history of cases imposing similar duties at common law.

The FCC is also wrong to argue that the Companies waived their jury-trial rights by paying the penalties under protest and challenging the Orders, rather than refusing to pay and awaiting a possible collection action under 47 U.S.C. § 504(a) up to five years later. The Orders are final agency actions with real-world effects; indeed, the FCC acknowledges that it may use its untested factual findings in license-

renewal decisions and penalty calculations. Further, at least in some jurisdictions where the government could bring a § 504 collection action, the Companies would not have the right to raise factual *and* legal challenges to the Orders. The possibility of a government-initiated collection action therefore does not satisfy the Seventh Amendment and Article III. And the public-rights exception is inapplicable—it is limited to historically defined categories of cases, and there is no history of agencies adjudicating civil-penalty actions against common carriers.

*Second*, the FCC is incorrect that the device-location information at issue—information passively generated when a mobile device pings cell towers to support both voice and data services—is CPNI under § 222(h)(1)(A). The FCC says that a voice service need not be in use to constitute a "telecommunications service" under the statutory definition. But § 222 covers information relating to the "location … of use" of a telecommunications service. 47 U.S.C. § 222(h)(1)(A). Only "call location information" fits that description. The FCC is also wrong that device-location information stems "solely" from the "carrier-customer relationship." *Id.* The FCC emphasizes the "relationship" between the Companies and their customers, but the *carrier*-customer relationship

2

pertains only to *voice* services—the only services to which § 222 applies. The FCC agrees that the information here supported voice *and* (non-covered) data services.

*Third*, the FCC erroneously asserts that if this Court agrees with the FCC's novel interpretation of CPNI, then the Orders necessarily satisfy the Constitution's fair-notice requirement. That view flouts precedent requiring that a regulated entity be able to identify its obligations with ascertainable certainty. Given that prior guidance supported the Companies' understanding of CPNI, the FCC's concededly new interpretation of the statute was not ascertainably certain.

*Fourth*, the FCC does not defend its liability determination under the arbitrary-and-capricious standard. Instead, the agency wrongly asserts that substantial-evidence review governs the Companies' arguments, even though that standard applies only to challenges to pure factual determinations rendered after a formal hearing. Regardless, the Orders are untenable. The FCC insists that each Company should have immediately terminated its entire LBS program based on one news article about criminal misconduct involving a single, rogue LBS provider (Securus)—misconduct that the FCC *itself* knew about for months before

the article. But this hindsight-based determination fails to grapple with the reality that a draconian overreaction would have cut off valuable, even life-saving services offered by AAA, Life Alert, and other LBS providers. The Companies responded promptly and prudently to the reporting by terminating Securus's access and then safely phasing out their LBS programs. The "reasonable measures" standard under 47 C.F.R. § 64.2010(a) required nothing more.

*Finally*, the FCC violates both the statutory maximum and the requirement of reasoned decision-making in defending its massive forfeitures. The fact that multiple LBS providers participated in each Company's LBS program does not, for purposes of the statutory maximum, transform a single, continuing violation—each Company's purported failure to reasonably safeguard location information—into dozens of separate violations. The FCC offers no principled basis for assessing penalties on a per-LBS-provider basis, and it never explains how the forfeitures here align with penalties imposed in other proceedings, which reserve the largest penalties for intentional misconduct.

The Court should grant the petitions.

**ARGUMENT**

## I. The Orders Violate The Seventh Amendment And Article III

### A. Civil Penalties Require A Jury Trial In An Article III Court

As the Companies explained, the Orders should be vacated because the Seventh Amendment and Article III prevent the FCC from imposing civil penalties without a jury trial. Opening Br. 28-34 ("Br."). Civil penalties are *classic* legal remedies. *Id.* at 29-31. And the FCC's claim that the Companies breached a legal duty by failing to reasonably protect customer information is closely analogous to common-law negligence. *Id.* at 31-32. Accordingly, the FCC was constitutionally required to proceed with its claims in federal court, where a neutral judge and properly instructed jury would have decided all legal and factual issues. *Id.* at 28-34.

The FCC does not and could not dispute that the civil penalties here are a legal remedy, which "is all but dispositive" of the constitutional question. *Jarkesy*, 603 U.S. at 123. The Seventh Amendment applies to "Suits at common law," and at common law, only "courts of law issued monetary penalties" intended "to 'punish.'" *Id.* The FCC claims that this

is not an action "to *recover* civil penalties," but to determine liability. FCC Response Br. 36 ("Resp."). But the same was true in *Jarkesy*—there, as here, civil penalties would be "collected in a separate action" if the person refused to pay. *Id.*; *see* 15 U.S.C. §§ 77t(d)(3)(B), 78u(d)(3)(C)(ii); *see also*, *e.g.*, *SEC v. Gerasimowicz*, 9 F.Supp.3d 378, 381-82 (S.D.N.Y. 2014). What matters for constitutional purposes is that an agency is "seek[ing] civil penalties." *Jarkesy*, 603 U.S. at 120; *accord Tull v. United States*, 481 U.S. 412, 414 (1987) (government "seeking civil penalties").

The FCC nevertheless insists that its *cause of action* is not analogous to a common-law claim historically tried before a jury—the other relevant factor in the Seventh Amendment analysis. But the FCC agrees that the nature of the *remedy* is "the more important consideration," outranking the nature of the claim in the analytical hierarchy. Resp.34-35 (quoting *Jarkesy*, 603 U.S. at 123); *see Tull*, 481 U.S. at 421 & n.6 ("reject[ing]" argument that "both the cause of action and the remedy must be legal"). And a civil-penalty remedy is practically conclusive. *See Tull*, 481 U.S. at 418-25; *Jarkesy*, 603 U.S. at 122-25.

In any event, the nature of the claim here "confirms" that the Seventh Amendment applies. *Jarkesy*, 603 U.S. at 125. The FCC's

"reasonable measures" claim under 47 C.F.R. § 64.2010(a) has a "close relationship" to a common-law negligence claim. *Jarkesy*, 603 U.S. at 125. The FCC says that the Companies' common-carrier duty to protect customer information under 47 C.F.R. § 64.2010(a) was "unknown to the common law." Resp.36. But the FCC agrees that its CPNI claim rests on "a duty of care to refrain from unreasonable actions that might harm others." *Id.* at 36-37. This "reasonable measures" standard (47 C.F.R. § 64.2010(a)) is analogous to common-law negligence. *See Lillie v. Thompson*, 332 U.S. 459, 460 (1947) (per curiam) (plaintiff stated negligence claim against common-carrier railroad for failing to "tak[e] reasonable measures to protect her"). And while the CPNI claim may be a "modern statutory creation," Resp.37, a claim's "statutory origins" make no difference under *Jarkesy*, 603 U.S. at 135.

The common law also imposed on common carriers and telegraph companies a duty to act reasonably with respect to goods *or* information entrusted to their care. In *Primrose v. Western Union Telegraph Co.*, 154 U.S. 1, 12 (1894), for example, the sender of a message sued the telegraph company "to recover damages for a mistake in the transmission of the message." The Court explained it was "settled law" that "common

carriers" were subject to "liability for damages caused by the negligence of themselves or their servants," and that "telegraph companies" were treated "'[l]ike common carriers'" in that regard, even though "[t]hey are entrusted with nothing but an order or message," rather than "actual and manual possession" of goods. *Id.* at 14-15 (quoting *S. Express Co. v. Caldwell*, 88 U.S. (21. Wall.) 264, 269-70 (1875)). That duty of reasonable care "resembles" the Companies' regulatory duty to take reasonable measures to protect CPNI, even if the two are not "identical." *Jarkesy*, 603 U.S. at 126, 135.

Moreover, other torts at common law protected against the disclosure of private information. As one court recently explained, "public disclosure of private facts" was a "harm 'traditionally recognized as providing a basis for lawsuits in American courts.'" *Salazar v. NBA*, 118 F.4th 533, 541-42 (2d Cir. 2024). A statutory claim "provid[ing] redress for violation of a person's protected interest in the privacy of his or her motor vehicle records" similarly resembles "common-law tort actions [that] provide redress for interference with protected personal or property interests." *Pichler v. UNITE*, 542 F.3d 380, 388-89 (3d Cir. 2008); *see U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*,

489 U.S. 749, 763 (1989) ("both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person").

The FCC cannot avoid that conclusion by invoking decisions under the Federal Tort Claims Act. Resp.37. That federal statute "makes the United States liable in accordance with applicable local tort law," meaning a federal official can be liable only where "a private person in like circumstances could be found liable in tort under local law." *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157-58 (D.C. Cir. 1985). Determining whether local law is so "analogous" to federal law that both would impose liability for the same conduct, *id.*, is manifestly different from the Seventh Amendment analysis, which merely asks whether the statutory *claim* at issue "*resembles* a traditional legal claim," *Jarkesy*, 603 U.S. at 135 (emphasis added); *see id.* at 126 (federal securities-law fraud and common-law fraud had a "close relationship" even though they differed "[i]n some respects").

The FCC's concern that too many claims might trigger the Seventh Amendment and Article III carries no weight. Resp.37. The FCC's claim for civil penalties under § 222 squarely implicates the jury-trial right

under *Jarkesy*, which is all the Court needs to decide in this case. Besides, compliance with the Constitution is not optional simply because it is inconvenient to the government: The purpose of the Seventh Amendment is to "secur[e]" the jury-trial right "'against the passing demands of expediency or convenience.'" *Jarkesy*, 603 U.S. at 122.

## B. A Possible Section 504(a) Collection Action Does Not Cure The Problem

Section 504(a) allows the Department of Justice to bring "suit for the recovery" of unpaid forfeitures in "a trial de novo." 47 U.S.C. § 504(a). The FCC says that because a collection action would include a jury trial, the FCC did not need to afford the Companies a jury trial in assessing liability and damages. Resp.29-33. And the FCC further claims that by appealing the FCC's jury-less imposition of civil penalties, the Companies somehow waived their jury-trial rights. That is not the law.

The Companies invoked their right to a jury trial before the FCC, but the FCC rejected the argument and unilaterally imposed massive penalties, JA40-46 ¶¶ 97, 104-05, 108-09. By paying the penalties under protest and challenging the FCC's erroneous constitutional decision—as circuit precedent permits, *see AT&T Corp. v. FCC*, 323 F.3d 1081, 1083-

85 (D.C. Cir. 2003)—the Companies did not *waive* the right to a jury trial; they *preserved* it.  Br.34-35.

The FCC says that if the Companies wanted a jury trial, they should have refused to pay the ordered forfeitures and awaited a § 504(a) collection action.  Resp.30.  But a jury trial in a *collection action* is no substitute for a jury trial on *liability and damages*.  As the Companies explained, a § 504(a) collection action does not guarantee the ability to present factual *and* legal defenses:  Some courts hold that § 504(a) defendants may raise only *factual* arguments, and the government has the discretion (and incentive) to bring collection actions in jurisdictions bound by that precedent under § 504(a)'s functionally nationwide venue provision.  Br.35-36; *see* Chamber of Commerce Amicus Br. 13-14 ("Chamber Br.").

In addition, the Companies have no right to initiate a § 504(a) collection action.  The Department of Justice decides whether, where, and when to bring the action, subject to a five-year limitations period.  Br.36-37.  In the meantime, or if the government chooses not to move forward, the Companies would be stuck with the FCC's final order concluding that they "willfully and repeatedly violated section 222."  JA46 ¶ 108; JA322

¶ 85.  The FCC downplays that harm, asserting that the Companies do not dispute the underlying facts.  Resp.31.  But the Companies vigorously dispute the *legal relevance* of those facts and the FCC's *findings of liability* based on them—and the FCC acknowledges that it could rely on its (distorted) view of the facts in spectrum-license renewals or enhancing future penalties.  Br.37; Chamber Br. 17-21.[1]

Thus, according to the FCC, the Companies must choose between a potential jury trial under the Seventh Amendment (in a later-filed § 504(a) action), *see Jarkesy*, 603 U.S. at 121-26, and their Article III right for a federal court to decide the law (by seeking direct review under 47 U.S.C. § 402(a)), *see Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856).  The Companies cannot pursue both options—refusing to pay the forfeiture is a precondition to a § 504(a) collection action *and* bars review in this Court.  *AT&T Corp.*, 323 F.3d at 1083-85.

---

[1] *Action for Children's Television v. FCC*, 59 F.3d 1249, 1261-62 (D.C. Cir. 1995), on which the FCC relies (at 30-31), does not change the calculus. That case did not involve a forfeiture, predated the FCC's policy of relying on untested factual findings to make adverse determinations in future agency proceedings, and assumed a *full* trial de novo that some jurisdictions forbid.

The government cannot condition the Companies' Seventh Amendment jury-trial rights on forgoing their Article III rights, or vice versa. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests"). The Companies' decision to pay the fines under protest to vindicate their constitutional and other legal rights was no waiver. CTIA Amicus Br. 28 ("CTIA Br.").[2]

## C. The Public-Rights Exception Does Not Apply

The FCC also contends that the public-rights exception excused the need for a jury trial. Resp.37-41. But a claim for civil penalties falls outside the narrow, historically defined classes of cases traditionally resolved by the political branches, such as matters involving immigration or tribal relations. Br.32-34.

The FCC asks this Court to recognize a new public-rights category for claims against common carriers. Resp.38. But no cited case suggests that claims for monetary penalties against common carriers were

---

[2] The "waive[r]" in *Illinois Citizens Committee for Broadcasting v. FCC* is not comparable to this case; the regulated party there paid the forfeiture but did *not* seek review. 515 F.2d 397, 401, 405-06 (D.C. Cir. 1974).

historically adjudicated outside the courts. *Munn v. Illinois*, 94 U.S. 113, 124-26 (1877), on which the FCC relies (at 38), stands for the unremarkable proposition that a state legislature may, consistent with due process, exercise its police power to regulate property "'affected with a public interest,'" including the property of common carriers. It does not endorse imposing monetary penalties on common carriers via administrative proceedings. *Crowell v. Benson*, 285 U.S. 22 (1932) (cited at Resp.39), is similarly inapposite. Its reference to "interstate and foreign commerce," *id.* at 51, does not suggest that the public-rights exception sweeps as broadly as Congress's authority under the Commerce Clause. Indeed, *Jarkesy* forecloses that view: It held that claims under federal securities laws enacted under the Commerce Clause are still subject to Article III and the Seventh Amendment, notwithstanding the dissent's contrary suggestion. *See* 603 U.S. at 129 & n.1; *id.* at 185 (Sotomayor, J., dissenting).

The FCC also notes the FCC's historical ties to the Interstate Commerce Commission ("ICC"). Resp.39. But that connection supports the Companies. From the ICC's inception, Congress, the ICC, and the courts recognized that the Seventh Amendment limited the ICC's

enforcement authority, such that money damages could only be awarded by a court of law. *See Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 430 (1915) (statute treating ICC's findings as *prima facie* evidence in jury trial "takes no question of fact from either court or jury"); *see also* 19 Cong. Rec. 5150 (1888) (discussing statutory amendment to permit money-damages claims in federal court).

In addition, the FCC argues that the public-rights exception applies because the allocation of wireless spectrum implicates public rights. Resp.40-41. But the "claims at issue" here, *Jarkesy*, 603 U.S. at 127, have nothing to do with spectrum allocation under Title III of the Act. Instead, the FCC imposed civil penalties for allegedly breaching a Title II duty to reasonably protect CPNI. *E.g.*, JA17. The fact that a company uses a public right does not mean that all claims against that company are swept into the narrow public-rights exception.[3]

---

[3] The FCC's combination of functions compounds the constitutional problems. Though *Withrow v. Larkin*, 421 U.S. 35 (1975), permits agency adjudication as a general matter, that precedent should be revisited, and even on its own terms prohibits an agency adjudicator from prejudging a case. Br.38-39. The FCC's argument (at 43) that members of the Commission "did not improperly prejudge the Carriers' cases" is belied by an objective review of their statements, Br.38-39.

## II. The Orders Exceed The FCC's Statutory Authority

The Orders should also be vacated because they exceed the FCC's statutory authority. The device-location information on which the Orders were based neither (1) "relates to the … location … of use of a telecommunications service," nor (2) "is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A).

### A. The "Location" Component Of CPNI Covers Only Call-Location Information

As the Companies explained, the "location" component of CPNI covers only call-location information—that is, information about the location of a phone when a customer makes or receives a voice call. Br.41-51. That conclusion flows from the plain text of § 222, which defines CPNI to refer only to the location "*of use* of a telecommunications service." 47 U.S.C. § 222(h)(1)(A) (emphasis added). History and context confirm that reading—all references to "location" in § 222 were added simultaneously in 1999, demonstrating that the "location" component of the CPNI definition refers to "call location information." Br.43-44 (citing 47 U.S.C. § 222(d)(4), (f)(1), (h)(1)(A)). And the FCC's own guidance—

including its *2007 CPNI Order* and *2013 CPNI Ruling*—has consistently referred only to call-location information as location CPNI. *Id.* at 44-45.

The FCC agrees that the Orders are not based on call-location information. But it raises several arguments to support the Orders' position that the location of a device when it passively pings cell towers— which happens whenever the device is powered on—is nevertheless CPNI. Each is mistaken.

***"Telecommunications service."*** The FCC first argues that § 222's use of the term "telecommunications service" supports a broad reading of the CPNI definition. Because a telecommunications service is defined as the "offering" of voice services, 47 U.S.C. § 153(50), (53), and because the offering of such services does not "turn on whether a customer is presently *using* the service offered," the FCC claims, CPNI includes more than just "a customer's location when talking on the phone." Resp.45-46.

That strained argument fails to account for the language of § 222, which defines CPNI to include enumerated categories of information relating to the use of a telecommunications (voice) service, including the "location … of use"—not generic information about voice-service

offerings.  47 U.S.C. § 222(h)(1)(A).  Voice services are used when calls are sent and received; accordingly, the "location" component of CPNI refers to "call location information."  *Id.* § 222(d)(4), (f)(1).

The FCC responds that "of use" modifies only "amount," not "location."  Resp.48-52.  Even if the FCC were correct, it would not change the result.[4]  And the FCC is wrong:  The "location" component of CPNI encompasses only information about the "location … of use" of a telecommunications service.  The CPNI definition covers information relating to the "quantity, technical configuration, type, destination, *location*, and amount *of use* of a telecommunications service."  47 U.S.C. § 222(h)(1)(A) (emphasis added).  As the Companies previously explained, "of use" modifies each noun in that integrated list.  Br.46-50.

To support its contrary interpretation of "of use," the FCC points to *Lockhart v. United States*, 577 U.S. 347 (2016).  Resp.50-51.  That case, however, involved the phrase "'relating to aggravated sexual abuse,

---

[4] The phrase "location … of a telecommunications service" would still be best read to refer only to call-location information.  47 U.S.C. § 222(h)(1)(A).  That reading aligns with § 222's express references to "call location information," focuses on "customer" information rather than generic network information, and aligns with the FCC's prior guidance.  Br.47, 49-50; *infra*, at 20-23.

sexual abuse, or abusive sexual conduct involving a minor or ward.'" 577 U.S. at 350 (quoting 18 U.S.C. § 2252(b)(2)). The Supreme Court concluded that the phrase "involving a minor or ward" modified only "abusive sexual conduct" because the items in that list have "varied syntax" and the list "does not contain items that readers are used to seeing listed together or a concluding modifier that readers are accustomed to applying to each of them." *Id.* at 352.

The CPNI definition is nothing like the list in *Lockhart*. All terms in § 222 are nouns and can readily be modified by "of use of a telecommunications service." *See* Br.46-47. The concluding modifier therefore "applies to the entire series." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012). The Supreme Court applied similar reasoning in *United States v. Bass*, 404 U.S. 336 (1971), where the statute applied to any person "'who receives, possesses, or transports in commerce or affecting commerce … any firearm'"—the modifier "'in commerce or affecting commerce'" "makes sense with all three" verbs and applied to all of them. *Id.* at 339-40. Numerous cases are in accord. *See Paroline v. United States*, 572 U.S. 434, 446-47 (2014) (applying the modifier "'as a proximate result of the offense'" to each item in a list of

incurred losses); *Facebook, Inc. v. Duguid*, 592 U.S. 395, 403-04 (2021) (applying the modifier "'using a random or sequential number generator'" to both "'store or produce'").

Reading "of use" to modify each noun would not render "quantity of use" and "amount of use" duplicative, as the FCC contends (at 52). The phrase "quantity of use" refers to the number and frequency of calls, while "amount of use" refers to the duration of particular calls. Br.47 n.19. Indeed, it is the FCC's view that presents linguistic challenges: The phrase "destination … *of use* of a telecommunications service" readily refers to a dialed phone number, whereas the phrase "destination … of a telecommunications service" is difficult to understand and disconnected from "*customer* proprietary network information." 47 U.S.C. § 222(h)(1) (emphasis added). The FCC has no response to this point, which the Companies raised in their Opening Brief (at 47).

***"Use" of a telecommunications service.*** The FCC also argues that even if "of use" modifies "location," a telecommunications service is used "whenever the customer's device is *ready* to receive or place a call." Resp.46, 49 (emphasis added). That argument misinterprets "use." The Supreme Court has explained that "use" is an active word, *Dubin v.*

*United States*, 599 U.S. 110, 118-19 (2023), and—in the context of mobile devices—that passive signal pings occur "even if the owner is *not using* one of the phone's features," *Carpenter v. United States*, 585 U.S. 296, 300-01 (2018) (emphasis added). If the FCC were correct that any customer merely possessing a powered-on mobile device is "using" voice services (not data services), one would have expected the FCC to at least hint at that view when adopting the reasonable-measures rule. Br.44. But the order adopting that standard discussed only *call*-location information. *2007 CPNI Order* ¶ 5. The FCC's brief never reconciles its position today with its own historical discussions of CPNI.

The FCC's view that location CPNI is always being generated also conflicts with other guidance. In its *2013 CPNI Ruling* (¶ 28 n.66), the FCC explained that information pertaining to "the device's access of the carrier's data network"—an *information* service, not a telecommunications service—is *not* CPNI. That clarification would make little sense if mobile devices were always "using" telecommunications services and creating location CPNI.

Additionally, the FCC's new view improperly treats *all* location information as call-related information subject to common-carrier

regulation under § 222, even though—as the FCC acknowledges—the location information here "supported *both* data and voice services." Resp.47-48. That result is impermissible because § 222 is a common-carrier provision regulating only *telecommunications* (voice) services; information (data) services are subject to a different, light-touch regulatory regime under Title I. *See In re MCP No. 185*, 124 F.4th 993, 998-99 (6th Cir. 2025) (explaining this difference in vacating FCC's recent order reclassifying broadband as a telecommunications service). Because device-location information often is used only to provide information services not subject to § 222, it cannot be CPNI.

*"Call location information."* The FCC also seeks to distinguish the word "location" in the CPNI definition from the phrase "call location information" in § 222's operative provisions. Resp.48. But as the Companies explained, these terms are coextensive—Congress in 1999 *both* added "location" information to the definition of CPNI *and* amended § 222's substantive provisions to address how this "call location information" would be treated. Br.43-44 (citing 47 U.S.C. § 222(d)(4), (f)(1)). The differing phrasing simply reflects the differing linguistic structure of the CPNI definition compared to the operative provisions.

*Id.* at 48-49. The FCC offers no response to that straightforward point, much less a compelling reason to interpret these contemporaneously enacted terms incongruently.

To the contrary, the FCC's mismatched-terms interpretation produces absurd and dangerous results. If location CPNI encompassed *all* device-location information, not just call-location information, it would mean that § 222 *prohibits* carriers (absent the customer's express consent) from sharing device-location information with first responders and family during an emergency involving "the risk of death or serious physical harm," 47 U.S.C. § 222(d)(4), (f)(1), even though device-location information will often be more useful than call-location information in an emergency.

In sum, only call-location information constitutes CPNI. The Orders are therefore unlawful.

## B. The Location Information Was Not Made Available "Solely By Virtue Of The Carrier-Customer Relationship"

The device-location information at issue here is not CPNI for a second, independent reason: It was not made available "by the customer solely by virtue of the carrier-customer relationship," 47 U.S.C.

§ 222(h)(1)(A), because this passively generated location-information also supported non-common-carrier data services not encompassed by § 222, Br.51-53.

The FCC asserts that the relationship between *the Companies and their customers* was "undisputably" the "sole source of access to a customer's data." Resp.53.  But the Companies wear two hats, providing both common-carrier telecommunications services and non-common-carrier information services.  The scope of the FCC's regulatory power—and the applicability of § 222—"depends on the type of service" at issue. *MCP No. 185*, 124 F.4th at 999; Br.7-9, 51-53.  Section 222's reference to the *carrier*-customer relationship encompasses only the *voice-services* relationship between a customer and provider—the only "carrier" to which § 222 refers is a common carrier providing voice services under Title II.  47 U.S.C. § 222(h)(1); *see id.* § 153(11), (51) (defining "carrier" and "telecommunications carrier" as "common carrier[s]").  A company providing Title I information (data) services is not a common carrier.  And when a company provides *both* data and voice services, it is a common carrier "only to the extent that it is engaged in providing telecommunications services." *Id.* § 153(51).

Accordingly, the passively generated device-location information here plainly was not provided "solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A). The FCC admits that this device-location information "supported *both* data and voice services," Resp.47-48, and does not contest that the Orders even cover location information from customers who subscribed *only* to data services and therefore had *no* carrier-customer relationship. A voice-services relationship thus is not the *sole* reason the Companies obtained the information. CTIA Br. 16-18.

The FCC contends this plain-text result is "anomalous," wrongly asserting that a carrier providing only voice services would need to protect location information, whereas a company providing both voice and data services would not. Resp.54. But *both* companies would need to protect call-location information—it is the FCC's erroneous reading of the first part of the CPNI definition, *see supra*, at 16-23, that creates the supposed anomaly here. Further, *other* data-privacy regimes may apply to information not covered by § 222. JA50 (Carr dissent) (arguing for FTC jurisdiction). The device-location information at issue is not CPNI.

## III. The Orders Violate Principles Of Fair Notice

The Orders also violate due process because the FCC failed to provide fair notice of its novel view that CPNI includes *all* device-location information. Not only did the Companies—like other wireless carriers—reasonably interpret location CPNI to encompass only call-location information, but the FCC *itself* appeared to endorse that view in its prior guidance. Br.53-57. Only in these enforcement proceedings—after the conduct had already occurred—did the FCC announce its new, expansive view of CPNI.

The FCC never disputes that its prior guidance and the industry's interpretation focused only on call-location information. Indeed, before the Fifth Circuit in the AT&T case, the FCC explicitly agreed, as it must, that its reading of the statute is "new"—it adopted a "new legal rule." Oral Arg. Recording 19:03-19:45, *AT&T, Inc. v. FCC*, No. 24-60223 (5th Cir. Feb. 3, 2025).

The FCC nonetheless argues that fair notice was satisfied here merely because the FCC's "interpretation" of § 222 supposedly "was the most natural." Resp.55-56. But even if that were true—it is not, *supra*, at 16-25—fair-notice principles are not automatically satisfied anytime

the government's interpretation is best. In *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-58 (2012), for example, the Supreme Court vacated an FCC penalty on fair-notice grounds without first deciding whether the FCC's view was the most natural. *See also Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 627-32 (D.C. Cir. 2000) (applying government's view of regulation, but barring penalties because government's view was not ascertainably certain).

Endorsing the FCC's fair-notice argument would gut that doctrine and depart from this Court's fair-notice precedent. After *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts and agencies must apply the best reading of a statute. But *Loper Bright* did not change the law on fair notice, and courts have continued to apply that doctrine to set aside agency actions like the FCC's here. *See*, *e.g.*, *Ams. for Beneficiary Choice v. HHS*, 2024 WL 3297527, at *4 (N.D. Tex. July 3, 2024); *Nissan Chem. Corp. v. FDA*, 2024 WL 3724686, at *6 (D.D.C. Aug. 8, 2024). This Court should do the same.

## IV.   The Orders Are Arbitrary And Capricious Because The Companies Employed Reasonable Protective Measures

The FCC's liability determinations—that both Companies violated § 222 by failing to immediately terminate their entire LBS programs

after the *New York Times* reported a single breach involving criminal misconduct—are arbitrary and capricious. The Companies took "reasonable measures" to protect the location information at issue, 47 C.F.R. § 64.2010(a): They employed rigorous, industry-standard protections to limit use of their LBS programs to authorized purposes, and when the *New York Times* reported the Securus breach, the Companies swiftly cut off that rogue actor and decided within months to wind down their programs, similar to other carriers. Br.57-64. The FCC's contrary conclusion rests on impermissibly results-oriented, hindsight-based reasoning.

In its brief, the FCC *still* fails to account for the important, life-saving benefits of the Companies' LBS programs. *E.g.*, Br.12-13, 59-62; JA424-27; JA210. The FCC also fails to identify any actual, unauthorized customer harm from the continued operation of the LBS programs after the *New York Times* article. And the FCC makes no attempt to reconcile its liability determinations with its own failure to act, despite knowing of the Securus incident months before the Companies did. Br.18. Those omissions, by themselves, show that the FCC's liability determinations were arbitrary and capricious. *See Ohio v. EPA*, 603 U.S. 279, 292-93

(2024) (an agency does not provide "'a satisfactory explanation for its action'" when it "simply ignore[s] 'an important aspect of the problem'" at issue).

Notably, the FCC does not even argue that its liability determinations satisfy arbitrary-and-capricious review. Instead, it asserts—without citation—that the substantial-evidence standard applies. Resp.25. But that standard governs only basic factual findings, *see Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 120 (D.C. Cir. 2022), after a formal adjudication that includes a "public adjudicatory hearing," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *see Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1005 (D.C. Cir. 2021). The FCC held no hearing, *see* 47 U.S.C. § 503(b)(4), and the Companies challenge the application of law to facts, not merely a factual finding, *see* Br.61; *Wilkinson v. Garland*, 601 U.S. 209, 212 (2024). The arbitrary-and-capricious standard applies.

With the benefit of hindsight, the FCC cites a few isolated facts that it says revealed a systemic problem. Resp.56-60. But T-Mobile conducted a risk assessment around the same time as the *New York Times* article that *affirmed* its aggregators' consent-capture process, Br.15-16, 58-59,

and T-Mobile had reason to trust its safeguards after LocationSmart disabled LocateUrCell's access based on its own independent processes, *id.* at 16, 62.[5] The record reveals that Sprint similarly acted reasonably. *Id.* at 58-59. Further, after the *New York Times* article, each Company decided to wind down its program after considering alternatives, just as other carriers did. To say that these prudent measures violated the CPNI rule is to effectively apply a strict-liability regime based on unannounced rules adopted after-the-fact, not the "reasonable measures" standard of 47 C.F.R. § 64.2010(a).

The FCC claims that the Companies "d[o] not fairly characterize" its liability determinations in arguing that the FCC required *immediate* termination, noting that the FCC did not impose fines for the first 30 days after the *New York Times* article. Resp.59-60 & n.12. But the Orders are clear that those 30 days were merely a "grace period" and that the FCC could have "used its discretion" differently. JA15 ¶ 34 & n.22;

---

[5] The FCC notes *T-Mobile* learned of the LocateUrCell incident through a third party. Resp.58 n.11. But the point is that LocationSmart had independently investigated LocateUrCell and disabled its access, suggesting T-Mobile's established safeguards were functioning well. Br.16.

JA24-25 ¶ 57 n.195; JA33 ¶ 74. The FCC similarly argues that it fined the Companies for failing to take "definitive steps to *remedy*" the supposed flaws, not for failing to "immediately *terminat*[e] their programs." Resp.59. But the Companies *did* take definitive steps, moving swiftly to cut off the rogue actor's access and promptly evaluating next steps for the programs as a whole. Br.59-61. The FCC insists that even this was insufficient because the aggregator-based *structure* of the programs was supposedly problematic—confirming that, notwithstanding the FCC's semantics, the only response acceptable to the FCC was to instantly terminate the LBS programs.

That approach would have been unreasonable, which is why *no* national carrier adopted it. And the FCC does not explain how the carriers could have reasonably ascertained the FCC's view that immediate termination was necessary to satisfy the reasonable-measures standard. That fair-notice problem independently bars the FCC from imposing liability. Br.63-64.

The Orders' liability determinations are arbitrary and capricious.

## V. The FCC's Penalties Are Unlawful And Arbitrary

### A. The Penalties Exceed The Statutory Maximum

The FCC could not impose a penalty of more than $2,048,915 "for any single act or failure to act." 47 U.S.C. § 503(b)(2)(B); *see* JA34 ¶ 77 (inflation-adjusted maximum). Here, the FCC found only one violation for each Company—the continuance of its LBS program after the *New York Times* article. Br.64-67; Chamber Br. 21-28.

The FCC claims that the Companies committed numerous violations because the LBS providers offered different services and had individual contracts with the aggregators. Resp.61. That misses the point. The Orders imposed penalties on the *Companies*. And the FCC faulted each Company for a single purported omission—"failure to terminate its program or impose reasonable safeguards" after the news report. JA33 ¶ 73; JA311 ¶ 61; *see* JA35 ¶ 79 (claiming T-Mobile's LBS program had "the same fundamental vulnerabilities" across all aggregators and providers); JA313 ¶ 66 (same for Sprint). That is *one* failure to act per Company.

The FCC still offers no principle to limit its statutory-penalty authority. Indeed, the FCC does not deny that, under its view, it could

have penalized the Companies for each *customer's* data supposedly at risk. That erroneous, extraordinary interpretation would lead to *hundreds of trillions of dollars* in fines, supposedly without exceeding the $2 million statutory cap. Chamber Br. 6-7, 24. The penalties are unlawful.

### B. The Penalties Are Arbitrary And Disproportionate

The FCC's penalties are also arbitrary and capricious for two related reasons. First, the FCC must explain how its forfeitures are consistent with those in other proceedings, *Friedman v. Sebelius*, 686 F.3d 813, 816 (D.C. Cir. 2012), yet the FCC has never done so. Repeating the facts and dismissing the Companies as "downplay[ing] the seriousness of the violations" does nothing to show that the penalties here are proportionate to those in *other* cases. Resp.63.

Second, the FCC's forfeitures are in fact disproportionate. The FCC has only ever imposed fines of this size for intentionally fraudulent or harmful misconduct, which is not the case here. Br.67-69 (collecting cases). Indeed, the last LBS providers with access to location information—those who drove the per-day penalties the highest—were AAA, Life Alert, and other trusted providers. JA208; JA407. The

penalties are "out of line with the agency's decisions in other cases" and thus arbitrary and capricious. *Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013).

*Friedman* illustrates both errors. There, an agency barred executives from participating in a federal program for 12 years. This Court held the penalty arbitrary and capricious because the agency "had never excluded anyone for more than ten years" based on similar violations, and because "the agency d[id] not even acknowledge, much less explain" its "departure." 686 F.3d at 828. So too here.

## CONCLUSION

The Court should grant the petition; hold unlawful, vacate, enjoin, and set aside the FCC's Orders; and order the FCC to refund the penalties the Companies paid pursuant to the Orders.

Dated:  February 18, 2025

Respectfully submitted,

/s/ *Helgi C. Walker*

Helgi C. Walker
Russell B. Balikian
Zachary E. Tyree
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504
hwalker@gibsondunn.com
rbalikian@gibsondunn.com
(202) 955-8500

*Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,500 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook font.

Dated:  February 18, 2025

/s/ *Helgi C. Walker*
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2025, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the D.C. Circuit and accomplished service by using the appellate CM/ECF system.


Dated: February 18, 2025                 */s/ Helgi C. Walker*

                                                 Helgi C. Walker